IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Brittany Campbell and Ricky Campbell,          Case No: 2:20-cv-2051

Plaintiffs,          Judge Graham

v.          Magistrate Judge Deavers

Anthony-Thomas Candy Co..,

Defendant.

Opinion and Order

Plaintiffs Brittany Campbell and Ricky Campbell bring this action relating to their employment at the Anthony-Thomas Candy Company.  Plaintiffs, who are married, separately lost their jobs at Anthony-Thomas in the Summer of 2019.  Anthony-Thomas terminated Brittany's employment as the lead over wholesale orders on June 20, 2019.  She alleges that she was fired because she exercised her rights under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*, and because she had reported an incident of sexual harassment suffered by another employee. Ricky, who worked as a cook, was terminated on July 24, 2019.  He alleges that he was fired because he had exercised his rights under the FMLA, because he opposed the unlawful firing of his wife, and because of his African-American race.

This matter is before the Court on defendant's motion for summary judgment.  Anthony-Thomas argues that plaintiffs were fired for serious workplace misconduct.  In Brittany's case, the misconduct allegedly included a vulgar tirade against co-workers of Hispanic origin.  In Ricky's case, the misconduct allegedly included intimidating and insubordinate behavior toward his supervisors.

For the reasons discussed below, the Court grants in part and denies in part the motion for summary judgment.

## I.      Background

### A.      General Background of the Parties

Anthony-Thomas produces candy at a facility in Columbus, Ohio.  About 120 employees are employed there.  (Trifelos Dep. at 39).  Anthony-Thomas is a family-owned and operated business and, at the time of the events at issues, its President was Joe Zanetos and its Vice Presidents were his brothers Tim Zanetos and Greg Zanetos.  (*Id.* at 13).  Joe Zanetos's daughter, Candi Trifelos,

1

served as the Director of Retail Operations, and his son-in-law, Steve Scully, was the head supervisor.  (*Id.* at 14, 129).

Brittany Campbell's father, Jack Little, Sr., was a long-time shift supervisor at Anthony-Thomas.  (Trifelos Dep. at 167; B. Campbell Dep. at 25).  He asked Joe Zanetos if the company could hire is daughter and son-in-law, and Joe Zanetos agreed to do so.  (J. Zanetos Dep. at 98).

Brittany Campbell began her employment at Anthony-Thomas in 2014 as a line operator.  (B. Campbell Dep. at 13–14).  By 2017 she was trained and assumed the position as the lead over wholesale orders.  (*Id.* at 15–17).  Even in that position she was called upon to assist where help was needed and acted as a "float," including helping on the production line.  (*Id.*).  As the lead over wholesale orders, Brittany worked in the "finished goods packing area" where wholesale and retail store orders were prepared and processed.  (Trifelos Dep. at 16–17).  During the relevant time period, Brittany's supervisors were Trifelos and Keeta Nazarej.  (*Id.* at 29).

Ricky Campbell began his employment in 2014, about a month after his wife started.  (R. Campbell Dep. at 26–27).  He was hired as a cook and remained in that position until about three weeks before his employment was terminated.  (R. Campbell Dep. at 27–29).  Ricky worked in a kitchen area making batches of caramel, cream fillings and popcorn.  (*Id.* at 33).  He worked with three other individuals, including his immediate supervisor Shawn Jones.  (*Id.* at 31, 34).  Shawn Jones reported to the Production Supervisor, Glenn Hazlett, who in turn reported to the Operations Manager, Ben Spicer.  (Hazlett Dep. at 10; Spicer Dep. at 11).  In the last three or four weeks of his employment at Anthony-Thomas, Ricky was moved to packaging room to do box stacking, for reasons that will be explained below.  (R. Campbell Dep. at 33).  He worked there under the supervision of Ben Spicer.  (Wallace Dep. at 64).

### B.     The Facts Relating to Brittany Campbell's Claims

#### 1.     FMLA Leave

In 2019 Brittany was experiencing panic attacks and began seeing a doctor.  (B. Campbell Dep. at 55).  Anthony-Thomas had a policy of allowing employees 40 hours of unpaid leave per year.  (*Id.* at 77–78).  Brittany exhausted her unpaid leave by April 30, 2019.  (Doc. 31-2 at PAGEID 216–17).

In early May 2019, Brittany spoke with Human Resource Manager Sharon Wallace about requesting FMLA leave to attend upcoming doctors' appointments.  (B. Campbell Dep. at 52).  Wallace provided Brittany with paperwork to give to her doctor.  (*Id.* at 54).

Brittany saw her doctor on May 19 and May 22, 2019. (Doc. 31-2 at PAGEID 208–211). He completed the FMLA form and indicated that Brittany had "significant daily generalized anxiety" which would likely interfere with her "general effectiveness at work" and for which she would need to miss work to attend further medical appointments. (*Id.* at PAGEID 209–210).

On May 30, Wallace gave Brittany a written notification stating that Wallace had found the doctor's FMLA form to be "inconclusive" regarding Brittany's ability to perform her job. (Doc. 31-2 at PAGEID 213). Wallace's notification also stated that Anthony-Thomas needed more information from Brittany's doctor regarding the course of treatment. (*Id.* at PAGEID 214). The notification, however, did state that Anthony-Thomas had approved Brittany's request for FMLA leave to attend doctors' appointments. (*Id.*). Wallace and Trifelos met with Brittany in person to explain that they needed more information from her doctor. (Trifelos Dep. at 95).

There is no record that Brittany ever produced the additional information Wallace requested. According to Brittany, she had a follow-up conversation with Wallace. (B. Campbell Dep. at 67). Brittany explained that she would be able to perform her work "every single day" and only wanted time off to attend doctor's appointments. (*Id.* at 68). Upon hearing this, Wallace allegedly told Brittany that she would not need to produce any further information from her doctor and that she was approved to go to her appointments. (*Id.* at 67–69).

## 2. Report of Sexual Harassment

In June 2019, Ricky told Brittany that he had observed Ben Spicer flirting with female employees. He observed Spicer approach one of the women and pull the back of her bra strap while she was standing on the production line. (B. Campbell Dep. at 118–19; R. Campbell Dep. at 65–66). The incident occurred while Ricky was working as a box stacker. (R. Campbell Dep. at 67).

On June 14 Brittany reported the incident to Wallace. (B. Campbell Dep. at 117–18, 133). Wallace said that she would inform head supervisor Steve Scully. (*Id.* 121). Wallace in turn notified Scully. (Wallace Dep. at 47; Doc. 31-2 at PAGEID 272). Scully spoke with Ricky and said that he would speak with Spicer about the allegation.[1] (R. Campbell Dep. at 66).

Neither Brittany nor Ricky heard any more of the matter. (B. Campbell Dep. at 118; R. Campbell Dep. at 66). Wallace did not know what happened after she spoke to Scully. (Wallace Dep. at 48)

---

[1] The parties did not submit a deposition of Scully. Trifelos testified that he passed away in December 2020, before the depositions in this case were taken. (Trifelos Dep. at 129).

According to Spicer, he first became aware that Brittany had reported the allegation of sexual harassment to Wallace on the day that Brittany's employment was terminated. (Spicer Dep. at 32). He then discussed the allegation with Scully. (*Id.* at 33).

### 3. The Break Room Incident

At the 10:00 a.m. break on June 20, 2019, Brittany went to the break room. (B. Campbell Dep. at 102–103). As she retrieved a bag out of the refrigerator, Glenn Hazlett was talking nearby with a female employee named Erika Vargas. (*Id.* at 82). They were talking loudly enough that "everybody could hear." (*Id.*).

According to Brittany, it was common for Hazlett, who had been employed at Anthony-Thomas for about 40 years, to "fraternize" with Vargas. (*Id.* at 82, 84). For several years he had "flirted" with her, and he would pick up her lunch and pull her away from work assignments to talk with him for extended periods of time. (*Id.* at 83). Brittany believed that everybody at the factory knew about Hazlett's fraternizing with Vargas. (*Id.*).

In the break room that day, Brittany heard Vargas speak of an upcoming trip to New York. (*Id.* at 82). She then heard Hazlett ask Vargas if he could go with her. (*Id.*). Hazlett's question "striked a button" with Brittany." (*Id.*).

Brittany moved toward an area where two employees, Joe Lerch and Darren (whose last name has not been identified), were sitting. When Hazlett walked near, Brittany commented to Darren, "[W]ow, I wonder how Shelly [Hazlett's wife] would feel about this?"[2] (*Id.* at 82–83). Hazlett turned to Brittany and asked, "[W]hat did you say about my wife?" (*Id.* at 83).

Brittany testified that "how [Hazlett] he said it, how he approached me, I felt like I was being attacked." (*Id.*). Brittany told Hazlett, "[D]o not talk to me." (*Id.* at 86). Hazlett then turned around and left the break room. (*Id.* at 87). At that point, Brittany felt like she was about to have a panic attack and "needed to get away from the situation." (*Id.* at 87). Another employee, Liz Larva, tried to calm Brittany down. Brittany remembers asking Liz, "[W]hat if Erika's husband and kids found out about this?"[3] (*Id.* at 89).

Because supervisor Keeta Nazarej was absent on extended leave, Brittany asked her acting supervisor if she could go home, and she received approval to do so. (*Id.*). She then left work.

---

[2] Brittany testified in her deposition that she knew the name of Hazlett's wife because Brittany's dad at some point married Hazlett's sister. (*Id.* at 85).

[3] In her deposition, Brittany described Vargas as a "girl" who was from either Mexico or Puerto Rico. (*Id.* at 88).

Anthony-Thomas asserts that Brittany engaged in an obscenity-laced tirade against "Mexican" co-workers before she left. Spicer and Trifelos, who were not in the break room, heard that there had been an incident. (Spicer Dep. at 40; Trifelos Dep. at 145). Spicer was told by Vargas and another eye witness, Sarai Barrera, that Brittany was "being loud and using bad language." (Spicer Dep. at 42). Specifically, Spicer was told that Brittany was screaming the words "fuck Mexicans" and that her words "looked to be directed at the people in the room." (*Id.*).

Spicer tried to find Brittany to talk to her but discovered that she had left the building. (*Id.* at 42).

Spicer and Trifelos alerted Joe Zanetos and Scully about what they had heard. They decided to review video footage[4] of the break room "to see who was in the room" so they could talk to at least some of those individuals. (*Id.* at 42–43). Spicer spoke with Joe Lerch, Liz Larva and Perla James. (*Id.* at 43). These employees confirmed the earlier reports Spicer had received. (*Id.* at 46). In total, Spicer received accounts from up to seven people who agreed that Brittany "was being loud and aggressive" and was "using language like 'fuck Mexicans,' 'this place is fucking bullshit,' . . . very mean, hateful things, to a group of people that were inside the room." (*Id.* at 41).

Trifelos spoke with several employees who had been in the break room, including Larva, Vargas and Lerch. Trifelos was told that Brittany was "shouting 'F'ing Mexicans' to a roomful of Mexicans that were on break." (Trifelos Dep. at 148). Trifelos believed the video footage supported a conclusion that Brittany's behavior was inappropriate. According to Trifelos, the video showed Brittany "swinging her hands" and acting in a "confrontational" manner with Hazlett. (Trifelos Dep. at 134). As Hazlett left the break room, Brittany "charg[ed] toward him. Then she looked at the other employees and started shouting." (*Id.*).

After watching the video, Zanetos also interviewed a few of the employees who had been in the break room. (Zanetos Dep. at 33). One of them was Larva, whom Zanetos described as a "gently, elderly lady" who "wouldn't say a bad thing about anybody." (*Id.* at 34). Larva stated that when she walked into the break room, she could tell that Brittany was "in a huff." (*Id.*). She further told Zanetos that when she asked Brittany what was wrong, Brittany said, "[A]ll those fuckin' Mexicans," and said it loudly enough that everybody in the room heard it. (*Id.*). Larva was a long-time employee and Zanetos believed her account. (*Id.*). He also spoke with several others who confirmed that Brittany said words to the effect of "F'ing Mexicans." (*Id.* at 35).

---

[4] The video footage did not have any audio. (Spicer Dep. at 45). The video footage of the June 20, 2019 incident is not part of the record before the Court.

After speaking with various employees, Zanetos, Trifelos, Spicer and Scully conferred again. They agreed that Brittany's employment should be terminated. (Spicer Dep. at 48). According to Spicer, they all agreed that Anthony-Thomas "couldn't have a workplace that involved the things that Brittany Campbell had done that day," "where they feel threatened and that they are being harassed." (*Id.* at 48, 50). According to Trifelos, there was no doubt as to what Brittany had said and done and "no gray area" on the matter – Anthony-Thomas would not tolerate disparagement of a racial or ethnic group, nor would it tolerate intimidation and harassment of co-workers. (Trifelos Dep. at 138–149). In Trifelos's view, the company would have fired even its "most perfect employee" for committing the conduct in which Brittany had engaged. (*Id.* at 140).

Spicer called Brittany on that same day, June 20, and to inform her that her employment was being terminated immediately. (Spicer Dep. at 45). He told her that she was being fired because she had directed the words "fucking Mexican[s]" to co-workers. (*Id.* at 50). Brittany denied that she had used those words. (*Id.* at 50–51).

In her deposition, Brittany testified that she "probably said some cuss words that I shouldn't have said." (B. Campbell Dep. at 95). "I probably said the F word a couple of times. . . . I remember saying, '[T]his is F'ing ridiculous.'" (*Id.*). But she testified, "I never said anything about Mexicans." (*Id.* at 98). She further denied that directed her words at or against anybody and, though she admitted to being "loud," she denied having screamed. (*Id.* at 95–98).

Brittany agrees that she received a phone call on June 20 from Spicer notifying her that her employment had been terminated. (*Id.* at 102–03). According to her, Spicer declined to state the reason for her termination. (*Id.* at 104). She called and spoke with Zanetos, who "told me that I was being fired for saying 'fucking Mexicans.'" (*Id.* at 107). Brittany requested an opportunity to come in and explain her side of the story, but Zanetos "didn't want to hear it." (*Id.*).

Wallace prepared a termination letter, dated June 20, that was sent to Brittany. (Doc. 31-2 at PAGEID 280). It stated that the reasons for her termination were "Hate speech, Inappropriate language, You walked off the job, Threats to co-workers families, Previous disciplinary action." (*Id.*).

Brittany was not aware of any prior disciplinary action against her. (B. Campbell Dep. at 108–112). According to company records, on May 13, 2019 Hazlett had written a disciplinary report which stated that he witnessed Brittany calling supervisors "F-N Idiots" and "complaining about certain girls that could not speak English" loudly enough so that other employees could hear her. (Doc. 31-2 at PAGEID 195). The disciplinary report was on a form which had signature blocks for

the discipled employee and for the HR Manager; however, both of those signature blocks were left blank. (*Id.*). Hazlett testified that Zanetos had instructed him to document the May 13 incident but not give the form to Brittany to sign. (Hazlett Dep. at 15).

### C. The Facts Relating to Ricky Campbell's Claims

#### 1. Objection to His Wife's Termination

Ricky spoke with Zanetos within a day or two of Brittany's termination. (R. Campbell Dep. at 113; Zanetos Dep. at 47). Ricky expressed his belief that she had been wrongfully terminated because she reported on Spicer engaging in sexual harassment. (R. Campbell Dep. at 114). Ricky told Zanetos "how she reported the sexual harassment on Ben. And the day that she got fired, Ben was the one that called her and fired her. . . . [T]here was no write-ups, there was no warnings, there was no way of her to defend herself. She was just told by Ben, who she reported on, that she was no longer allowed on the property. So to me, I felt like that had retaliation." (*Id.* at 114–15). Zanetos told Ricky that they would investigate Brittany's firing. (*Id.* at 118).

Zanetos remembers Ricky asserting that his wife's termination was "wrong," but he does not remember why Ricky thought it was wrong. (Zanetos Dep. at 47). He denies that Ricky called her termination "unlawful" and denies that Ricky claimed it was in retaliation for Brittany's report of sexual harassment. (*Id.*).

#### 2. Leave for Treatment of Pancreatitis

In July 2019 Ricky had a swollen or inflamed pancreas, a condition called pancreatitis. (R. Campbell Dep. at 103). On Thursday, July 18, Ricky presented a doctor's note to Spicer. (Doc. 31-4 at PAGEID 441; R. Campbell Aff. at ¶ 2). The note stated that Ricky had been treated in the emergency room on July 17 and that he would be able to return to work on Monday, July 22. (Doc. 31-4 at PAGEID441). He needed time off from work so that he could go on a special liquid diet. (R. Campbell Dep. at 103).

Ricky was allowed to take the rest of the workweek off, and he returned to work on July 22. (*Id.*). Being on a liquid diet resolved the swelling, and Ricky did not need or anticipate needing any additional time off for the issue. (*Id.* at 142).

#### 3. Alleged Racial Slur and Discriminatory Treatment

Ricky testified that at some unspecified time, Hazlett called him a "kid." (R. Campbell Dep. at 93). According to Ricky, "when a man calls another man a 'kid,' that's a form of racism." (*Id.*). Hazlett attempted to explain that he had children who were Ricky's age, but Ricky believed that "you don't call a man a 'kid' under any circumstances." (*Id.* at 94).

7

Hazlett acknowledges that he called Ricky a "kid" and explains that he saw Ricky arguing with Shawn Jones and said "Come on, kid, just let it go." (Hazlett Dep. at 59). Hazlett recalls that Ricky expressed his displeasure at being called a "kid," and Hazlett apologized and promised not to say it again. (*Id.*).

Ricky states that he reported the matter to Wallace but never heard anything further about it. (R. Campbell Aff. at ¶ 4).

Ricky also testified that he believed he was treated differently because of his race. "[O]ther guys would cuss and carry on and nothing would get said to them, but anytime I would say a cuss word, they would call me to the office or try to sit down, write me up or something." (R. Campbell Dep. at 94). According to Ricky, Vice President Tim Zanetos "used to cuss me out all the time, and there was never no disciplinary actions [taken] against him." (*Id.*).

### 4. Interactions with Supervisors

Shortly after Brittany's employment was terminated, Zanetos received reports that Ricky had been making comments to Hazlett. (Zanetos Dep. at 54). Specifically, Spicer reported that Ricky was displeased at his wife's firing and had been confrontational with Hazlett. (Doc. 31-4 at PAGEID 415). Ricky's conduct allegedly included walking past Hazlett while saying the name of Hazlett's wife, as a way to try to bait him into an argument. (*Id.*; Hazlett Dep. at 51, 54). According to Hazlett, Ricky tried to "scare[]" and "intimidate" him and told Hazlett that he "was going to get" him. (Hazlett Dep. at 41).

In late June 2019, Zanetos and Scully decided to separate Ricky and Hazlett by moving Ricky to a different work area as a box stacker. (Zanetos Dep. at 53, 67; Spicer Dep. at 96). Ricky already had a reputation of not getting along with others, including Hazlett, and he sometimes was not allowed to take a lunch break at the same time as certain employees. (Zanetos Dep. at 61–62; Spicer Dep. at 80, 87; Hazlett Dep. at 35–36). Ricky "had a very strong behavioral pattern of trying to intimidate people," including staring and pointing at Hazlett. (Spicer Dep. at 88).

Though Ricky's new job as a box stacker was technically a "lower position" than a cook, Zanetos kept Ricky's pay the same. (Zanetos Dep. at 54). As a box stacker, Ricky worked near Spicer's office. (Spicer Dep. at 96).

According to Anthony-Thomas, Ricky's behavior became more disruptive and "aggressive." (Spicer Dep. at 88). Ricky complained to Spicer, Scully and Shawn Jones that him getting moved to a box stacker was "bullshit." (*Id.*). Spicer said that Ricky would stand outside his office and loudly make comments like: "this place will regret firing my wife," "this place will be boarded up soon,"

"the last job he [Spicer] was at[,] the company went bankrupt[,] so you know what is going to happen here," "[Spicer] could not even make it in the Army," and "they will lose all the wholesale business now." (Doc. 31-4 at PAGEID 415–16).

On July 24, 2019, Hazlett made a written report to Wallace of an incident which had occurred the previous day. He wrote that it was "another incident of harassment and intimidation from Ricky." (Doc. 31-4 at PAGEID 417). As Hazlett exited the restroom during a break period, Ricky passed in front of him and stopped and said, "[D]on't breathe on me man." (*Id.*). Hazlett ignored the comment and "walked around Ricky to clock back in from break." Hazlett noticed Ricky lingering in the hallway and tried to avoid him by going to the water fountain and to a hand sanitizer station. (Hazlett Dep. at 47). "None of this worked though as Ricky waited on [Hazlett] in the hallway." (Doc. 31-4 at PAGEID 417). Hazlett had to walk past him, and Ricky followed him down the hallway and into a stairway. Walking behind Hazlett, Ricky kept repeating, "[H]ey bro don't fucking breathe on me." (*Id.*). Hazlett at one point told Ricky that he was not supposed to be talking to him, to which Ricky responded, "[W]ell I am fucking talking to you." (*Id.*). Hazlett reported that he feared the situation would escalate "to the point where Ricky is going to do something crazy to me like punch me or push me down a flight of stairs." (*Id.*). Hazlett reported that he felt "threatened every time I am near [Ricky]." (*Id.*)

Spicer received Hazlett's report, and Spicer and Scully talked to Hazlett about the incident. (Spicer Dep. at 95, 106–107). Spicer and Scully then reported the matter to Zanetos. (*Id.* at 107). They and Trifelos reviewed video footage of the hallway area. (*Id.*; Zanetos Dep. at 73; Trifelos Dep. at 179). As Zanetos reviewed the video, he "could clearly see that Ricky said something to Glenn as Glenn was clocking in," and Hazlett appeared to have ignored Ricky's comment. (Zanetos Dep. at 73). Ricky walked through a doorway and out of the frame of the video. While Hazlett went to the drinking fountain, Ricky came back into the hallway and Hazlett "hem-hawed around" to kill time, washing and drying his hands. (*Id.* at 73–74). Instead of walking down the hallway in a manner which Zanetos would have expected if Ricky were returning to his work area, Ricky went around a corner and out of sight of the camera. (*Id.* at 83). Hazlett then walked down the hall and "all of a sudden Ricky popped up" around a corner. (*Id.* at 74). Ricky closely followed Hazlett toward the stairways. And Glenn is just walking on." (*Id.*). The camera lost sight of the two once

they entered the stairway.  According to Zanetos, the last you could see on the video was Ricky entering the stairway closely following Hazlett.[5]  (*Id.*).

 After reviewing the video, Zanetos believed that Ricky was "stalking" Hazlett.  (Zanetos Dep. at 88).  "Ricky had no reason to go around that corner and wait other than he was waiting for Glenn."  (*Id.*; *see also* Trifelos Dep. at 179 (explaining that Ricky should have already gone up the stairs but "instead, he waited to walk behind Glenn and stalk him and harass him")).  Zanetos and Spicer believed that Ricky's behavior on the video confirmed the accuracy of Hazlett's report and was "typical of the things Ricky" had been doing.  (Zanetos Dep. at 88; Spicer Dep. at 106, 110).  Zanetos discussed the matter with Trifelos, Spicer and Scully, and they agreed that Ricky's employment should be terminated.  (Zanetos Dep. at 89).  The decision to terminate was based on the July 23 incident and on Ricky's behavior in the weeks leading up to that point.  (*Id.* at 73).  According to Spicer, Ricky's conduct on July 23 represented a continuation of the harassing and aggressive behavior he had displayed against his supervisors since his wife was fired.  (Spicer Dep. at 105).  For Spicer and Hazlett, it reached the point that they worried about their safety – "where you would feel like he could assault you."  (*Id.*; Hazlett Dep. at 48).  Trifelos agreed that the video showed Ricky "stalking" Hazlett and that Ricky's "presence and his demeanor" had been threatening to Spicer and Hazlett "for a while."  (Trifelos Dep. at 178–80).

Zanetos instructed Spicer and Scully to inform Ricky that day that his employment was being terminated.  (Zanetos Dep. at 90).  Spicer and Scully met with Ricky, who allegedly became "aggressive" upon receiving the news.  (Doc. 31-4 at PAGEID 419.  He wanted to know why he was being fired and Spicer told him that "the first reason was his failure to follow and adhere to the attendance and tardiness policy."  (*Id.*).  As Spicer attempted to explain the other reasons – "recent conduct," "overall attitude and behavior," and "intimidating fellow employees," Ricky talked "loudly" over Spicer.  (*Id.*).  Ricky claimed that Spicer was lying and was trying to intimidate him.  When Ricky threatened, "I'm gonna get you," Spicer told Ricky that he had to leave, and Spicer and

---

[5] Zanetos initially testified in his deposition that "clearly you could see [Ricky's] mouth, he's saying something to Glenn" as they walked to the stairway.  (Zanetos Dep. at 74).  Upon being shown the video, Zanetos agreed that "[y]ou couldn't really tell in this video whether or not Ricky and Glenn talked" as they approached the stairs.  (*Id.* at 87).  The video of the July 23, 2019 has been submitted as an exhibit.  The Court notes that in the video, which lacks an audio component, both men have their backs to the camera and are walking away from the camera as they approach the stairs.  (Doc. 37 at time stamp 10:22:45 to 10:22:55).

Scully attempted to escort Ricky out of the building. (*Id.*). Ricky resisted and Scully called the police, at which point Ricky exited the premises. (*Id.*; Spicer Dep. at 126).

In his deposition, Ricky disputed the allegations that he threatened or intimidated Spicer and Hazlett. Specifically, he denies Spicer's claim that he stood outside Spicer's office and said that "this place will regret firing my wife" or "this place will be boarded up soon." (R. Campbell Dep. at 86). He denies that he intimidated Hazlett on July 23 and says that Hazlett's report of what happened that day was a "lie." (*Id.* at 89–91). According to Ricky, he was not even in the hallway with Hazlett on that day. (*Id.* at 91). He further denies Spicer's account of how he acted on July 24 upon being told of his termination; he specifically denies making threats or acting aggressively. (*Id.* at 98, 103).

Ricky states that after his wife was fired, Hazlett and Spicer would "stare" at him and "would walk over in [his] work area [and] make [him] feel uncomfortable." (*Id.*. at 117). He also claims that a couple weeks before he was fired, Hazlett had intimidated him by coming up behind him and breathing down his neck. (*Id.* at 91–92).

### D. The Plaintiffs' Lawsuit

Plaintiffs filed this lawsuit in April 2020 and later amended their complaint. The amended complaint asserts five claims.

In Count I both plaintiffs allege that Anthony-Thomas interfered with the exercise of their rights under the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.* The complaint alleges that Anthony-Thomas discouraged them from taking FMLA leave.

Count II asserts claims for FMLA retaliation. Plaintiffs allege that after they had indicated their intentions to take their respective FMLA leave, Anthony-Thomas retaliated by terminating their employment.

Count III asserts separate claims of retaliation under Ohio law. *See* O.R.C. § 4112.02(I). Brittany alleges that she was terminated in retaliation for reporting that her husband had observed an incident of sexual harassment. Ricky alleges that he was terminated in retaliation for opposing his wife's unlawful termination.

Count IV asserts that Anthony-Thomas discriminated against Ricky because of his race. *See* 42 U.S.C. § 2000e-2(a). In particular, Ricky alleges that he was treated less favorably than white co-workers.

Finally, Count V asserts a state-law race discrimination claim. *See* O.R.C. § 4112.02(A).

Anthony-Thomas has moved for summary judgment as to all of plaintiffs' claims.

## II.       Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

### III.    Discussion of Brittany Campbell's Claims

#### A.    FMLA Interference and Retaliation

The FMLA provides eligible employees with 12 workweeks of leave per year for certain purposes, including "a serious health condition that makes the employee unable to perform the functions" of her position. 29 U.S.C. § 2612(a)(1)(D). Leave may be taken intermittently when medically necessary or when the employer and employee agree. *Id.* at § 2612(b)(1). An employee who takes leave is entitled to reinstatement upon her return from leave to the position she held before the leave or to an equivalent position. *Id.* at § 2614(a)(1).

Two separate theories of recovery are available under the FMLA: interference with the exercise of FMLA rights, and retaliation against an employee's opposition to an unlawful FMLA practice. *Id.* at § 2615(a)(1) and (2); *see Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012).

To establish a prima facie case of FMLA interference, plaintiff must show that: "(1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled." *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006).

A prima facie case of FMLA retaliation requires that a plaintiff show that (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012).

Where, as here, plaintiff relies on indirect evidence, an FMLA claim is evaluated under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Donald*, 667 F.3d at 762. If plaintiff supports her prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment decision. *Seeger*, 681 F.3d at 284; *Tillman v. Ohio Bell Tel. Co.*, 545 Fed. App'x 340, 349 (6th Cir. 2013). If the employer carries its burden, then the burden of production returns to the plaintiff to demonstrate pretext by demonstrating that the proffered reason either had no basis in fact, did not actually motivate the action, or was insufficient to warrant the action. *Seeger*, 681 F.3d at 285; *Tillman*, 545 Fed. App'x at 349.

The amended complaint brings separate claims for FMLA interference and FMLA retaliation. In its motion for summary judgment, defendant argues that it did not interfere with Brittany's rights because it granted all of her leave requests.[6] *See* B. Campbell Dep. at 71 (acknowledging that Anthony-Thomas never denied any of her medical leave requests). Plaintiffs' response brief does not directly address this argument, and the only actionable conduct the brief identifies is the alleged retaliatory termination – that defendant fired Brittany because she intended to use FMLA leave.[7] *See* Doc. 39 at PAGEID 966. In other words, plaintiff claims that defendant interfered with her FMLA rights by firing her before she could take her leave. *See* B. Campbell Dep. at 127–28 (testifying that she had informed Wallace and Trifelos that she would need to attend future doctor's appointments). Because plaintiff's FMLA interference claim turns on defendant's reason or motive for terminating her employment, the Court will analyze the interference and retaliation claims as one and the same. *See Seeger*, 681 F.3d at 282–83 (analyzing interference and retaliation claims together where defendant granted plaintiff "all of the FMLA leave to which he was entitled" and the only issue was defendant's reason for terminating plaintiff).

Turning then to FMLA retaliation, defendant argues that plaintiff cannot establish a prima facie case because she cannot demonstrate a causal connection between her exercise of FMLA rights and defendant's termination of her employment. Defendant contends that it is beyond dispute that Brittany's vulgar and offensive "hate speech" against "Mexican" co-workers on June 20, 2019 was the reason for her termination.[8] Doc. 32 at PAGEID 463.

In response, plaintiff correctly states that the temporal proximity of her leave requests to her termination is sufficient to support a prima facie case. Brittany engaged in the FMLA request process with Wallace and Trifelos from early May 2019 up through at least May 30. *See* Doc. 31-2 at

---

[6] For purposes of the summary judgment motion, defendant does not dispute that Brittany was an eligible employee, that the FMLA applies to Anthony-Thomas as an employer, or that Brittany had a health condition which qualified for coverage.

[7] Plaintiffs' brief did not pursue a theory of interference which the amended complaint had raised – that defendant discouraged Brittany from using her FMLA leave. After receiving an FMLA form from Brittany's doctor, Wallace requested more information about the course of treatment and Brittany's ability to perform her job. However, plaintiff now concedes that Wallace immediately withdrew her request for more information once Brittany explained that she needed leave only to attend doctor's appointments. *See* B. Campbell Dep. at 67–69.

[8] Defendant's motion for summary judgment addresses only plaintiff's ability to establish a prima facie case. Defendant does not address the other components of the *McDonnell Douglas* framework.

PAGEID 213. In late May or early June, she communicated to Wallace that there would be doctor's appointments which she would need to attend, though they had not yet been scheduled. On June 20, defendant terminated her employment prior to the appointments taking place.

Defendant argues that temporal proximity alone is insufficient, citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 763 (6th Cir. 2012). However, the *Donald* decision expressly concerned the third stage of the *McDonnell Douglas* framework, not the prima facie stage. The court stated, "[T]he law in this circuit is clear that temporal proximity cannot be the sole basis for finding *pretext*." *Id.* (emphasis added) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) ("[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual.").

The Sixth Circuit has held that temporal proximity of the degree present in this case will generally satisfy the causal connection element of a plaintiff's prima facie case. In *Seeger*, the court held that three weeks of "nearness in time" between the exercise of FMLA rights and plaintiff's termination suffices "to meet the low threshold of proof necessary to establish a prima facie case of retaliatory discharge." *Seeger*, 681 F.3d at 283. "[T]his Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *Id.* (internal quotation marks omitted) (citing cases involving a temporal proximity of less than three months); *Stein v. Atlas Indus., Inc.*, 730 Fed. App'x 313, 319 (6th Cir. 2018) (suggesting the line should be drawn at the ten-week mark).

The Court finds under *Seeger* that plaintiff has supported a prima facie case of FMLA retaliation by demonstrating that her termination occurred three weeks after she requested leave to attend upcoming doctor's appointments. In addition, the evidence supports a reasonable inference that Trifelos was displeased to find out that Brittany would be taking medical leave, and thus was motivated to retaliate against her. According to Brittany, she served as Anthony-Thomas's "main worker" over wholesale orders. B. Campbell Dep. at 128 (testifying that she "was the one that everybody called and asked questions [of]" because she "knew basically everything down there"). At some point during the process of pursuing FMLA leave, Brittany said that she "had to deal with her health." *Id.* at 129. To this Trifelos allegedly responded that she "had to protect her business." *Id.* Zanetos testified that Anthony-Thomas "didn't even have a back-up for [Brittany]" and that the prospect of her taking FMLA leave created a "problem" for them. Zanetos Dep. at 42.

15

Plaintiff's response brief, anticipating that defendant might discuss the remaining components of the *McDonnell Douglas* framework in its reply brief, argues that Anthony-Thomas's purported reason for firing her was pretextual.  Trifelos testified that the "reason for termination was [Brittany's] hate speech against her co-workers."  Trifelos Dep. at 158 ("[O]nly one reason, and that was the hate speech towards her co-workers which is harassing, intimidating and makes a workplace environment unsuitable . . . .").  But plaintiff cites Brittany's deposition testimony and her affidavit in which she denied having said, "Fucking Mexicans," and denied having directed her words against any race, class or person.  *See* B. Campbell Dep. at 95–100; B. Campbell Aff. at ¶ 5 ("I never stated the derogatory comments I have been accused of.").

Defendant emphasizes that it has many witnesses whose testimony flatly contradicts Brittany's denial of making offensive comments to Hispanic co-workers.  However, the Court cannot make credibility determinations at the summary judgment stage and finds that Brittany's testimony, if credited, sufficiently supports a showing that Anthony-Thomas's reason for her termination lacked a basis in fact.[9]

Defendant next argues that even if Brittany did not target Hispanic co-workers, she admitted to using "the F word a couple of times," which alone warranted her dismissal.  B. Campbell Dep. at 95.  Defendant points to the Anthony-Thomas employee manual's section on "dischargeable offenses."  An employee "may be terminated immediately without prior disciplinary action" for certain offenses, including, "Fighting with or striking another employee or other disorderly conduct during working hours."  Doc. 31-2 at PAGEID 197.  Defendant argues that Brittany's screaming of vulgarities amounted to disorderly conduct for which she could be terminated without progressive discipline.

The Court finds that defendant has not demonstrated beyond dispute that Brittany's use of "the F word a couple of times" warranted her termination for disorderly conduct.  Defendant has not submitted any evidence of other instances in which Anthony-Thomas discharged an employee because of the use of foul language.  Indeed, Brittany testified that that her language was no worse than what other employees had used without reprimand.  *See* B. Campbell Dep. at 95, 129 ("[E]verybody in the plant cusses, everybody.  They've said worse than I have, even from the owners

---

[9]  Whether the employee actually committed the alleged misconduct becomes "irrelevant" in suits where the employer establishes that it reached an "honest belief" that the employee had engaged in the misconduct.  *Donald*, 667 F.3d at 763; *see also Seeger*, 681 F.3d at 285–86; *Tillman.*, 545 Fed. App'x at 349.  Here, defendant did not invoke the honest belief rule at the summary judgment stage.

down.); *see also* R. Campbell Dep. at 94 (testifying that "guys would cuss and carry on and nothing would get said to them"); Hazlett Dep. at 17 (stating that he did not discipline or warn Brittany for a prior incident in which she used profanity).  Further, Brittany denied that she was screaming or shouting, and she "wasn't in anybody's face." B. Campbell Dep. at 95–96.

In sum, plaintiff has put forth evidence from which a factfinder could determine that defendant's purported reasons for firing her were not based in fact and that her admitted conduct was insufficient to warrant termination.  The motion for summary judgment is therefore denied as to plaintiff's FMLA claims.

### B.      Retaliation for Reporting Sexual Harassment

The amended complaint also asserts that Anthony-Thomas unlawfully terminated Brittany's employment because she reported that Spicer had flirted with female employees and sexually harassed a female subordinate by pulling her bra strap.  This claim is brought only under state law.

Ohio Revised Code § 4112.02(I) prohibits an employer from discriminating against an employee for opposing "any unlawful discriminatory practice defined in this section."  One such unlawful discriminatory practice is the creation of a sexually-hostile work environment, including harassment by a supervisor which affects an employees' conditions of employment.  *See Hampel v. Food Ingredients Specialties, Inc.*, 89 Ohio St. 3d 169, 176–77, 729 N.E.2d 726, 732–33 (Ohio 2000).

Retaliation claims under Ohio law are analyzed the same way as claims under the federal Title VII retaliation law.  *Allman v. Walmart Inc.*, 418 F.Supp.3d 224, 229 (S.D. Ohio 2019) (citing *Mengelkamp v. Lake Metro. Hous. Auth.*, 549 Fed. App'x 323, 329–30 (6th Cir. 2013)).  To state a prima facie claim of retaliation, a plaintiff must show that: (1) she engaged in a protected activity, (2) suffered an adverse employment action, and (3) there is a causal link between the protected activity and the adverse employment action.  *Id.* (citing *Johnson v. Univ. Hosps. Physician Servs.*, 617 Fed. App'x 487, 492 (6th Cir. 2015)).  If plaintiff establishes a prima facie case, the analysis follows the *McDonnell Douglas* burden-shifting framework.

In moving for summary judgment, defendant again argues that temporal proximity alone cannot satisfy the causation element of a prima facie case.  But here the temporal proximity is even more acute than it was for the FMLA claim.  On June 14, 2019, Brittany reported to Wallace that her husband had recently witnessed an incident of sexual harassment.  On June 20, Brittany's employment was terminated.

Defendant reiterates as well that it had a legitimate, non-discriminatory reason for firing Brittany and that she cannot make a sufficient showing of pretext.  These arguments fail at summary

judgment for the reasons discussed above.  Further, plaintiff has shown that Spicer, the subject of her complaint, participated in the decision to terminate her.  *See* Spicer Dep. at 48–50.  While the record before the Court is not entirely clear as to exactly when Spicer became aware of Brittany's report, when viewed in a light most favorable to plaintiff, it supports an inference that Spicer knew at the time the decision was made.  *See id.* at 32 (testifying that he became aware of the report "on the day that Brittany Campbell was fired.").

In an argument which is unique to the Ohio retaliation claim, defendant contends that Brittany's activity is not protected because she lacked a good faith belief that the harassment had occurred.  *See Allman*, 418 F.Supp.3d at 229–30 (holding that to have engaged in protected activity, plaintiff must have held a good faith belief that the conduct he opposed was unlawful).  Ricky stated in his deposition that he did not actually see Spicer pull the bra strap of the female employee.  Rather, he saw Spicer approach the employee from behind with his hands reached out toward her bra strap.  Ricky said that as Spicer "walked up to her to grab it, out of shock, I turned my head because I didn't want to really see if he did it or not."  R. Campbell Dep. at 67.  Defendant argues that because Ricky did not actually see Spicer pull the employee's bra strap, Brittany's report was not made in good faith.

The Court must reject this argument, as it ignores the rest of Ricky's testimony on the issue.  Ricky testified that Spicer had been flirting with female employees on the production line.  Even though Ricky looked away, the employee let out an audible reaction – a "yell" – that was consistent with having her bra strap snapped.  *Id.*  Ricky heard the yell and saw the employee "turn around and smack" Spicer.  *Id.*  Thus, Ricky observed (with his senses of sight and hearing) an incident that he reasonably perceived to amount to unwelcome sexual harassment.  Brittany in turn reported the incident to Wallace.  The Court finds that a jury could reasonably find from the evidence that Brittany had a good faith basis for reporting that Spicer had snapped an employee's bra strap.

Accordingly, defendant's motion for summary judgment is denied as to Brittany's retaliation claim under Ohio law.

## IV.  Discussion of Ricky Campbell's Claims

### A.  FMLA Interference and Retaliation

Defendant argues that it did not interfere with Ricky's FMLA rights because it granted him the leave he requested.  The Court agrees.  Ricky requested and was granted time off work on July

18 and 19, 2019 to treat his pancreatitis.  He did not request any additional time off and, unlike his wife, he did not indicate to defendant that would need to take future leave for his condition.

Plaintiff makes reference to defendant allegedly failing to "apprise" him of his FMLA rights.  Doc. 39 at PAGIED 968.  Plaintiff does not develop this argument and cites no law in support.  Regardless, defendant correctly notes that the FMLA does not provide a remedy to plaintiff "unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).  Anthony-Thomas granted Ricky all of the medical leave he requested, and plaintiff has presented no evidence that he was prejudiced by the alleged interference with his FMLA rights.

Turning to the retaliation claim, defendant again argues that temporal proximity alone is insufficient to support a prima facie case.  But Anthony-Thomas terminated Ricky's employment on July 24, less than a week after he took medical leave.  The Court finds that such acute temporal proximity supports a prima facie claim.  *See Seeger*, 681 F.3d at 283.

Defendant contends that it had a legitimate, nondiscriminatory basis for firing Ricky.  The reasons included his intimidating behavior toward Hazlett and Spicer and his poor attendance record.[10]  *See* Doc. 31-4 at PAGEID 419 (stating that the reasons for termination included "intimidating fellow employees" and "failure to follow and adhere to the attendance and tardiness policy").

At summary judgment, plaintiff has met his burden of demonstrating pretext.  Plaintiff has submitted evidence, which if credited, shows that there was no basis in fact for the accusation of intimidating conduct.  Ricky specifically denied that he threatened or intimidated Hazlett or Spicer.  *See* R. Campbell Dep. at 86, 89–91, 98, 103.  And he testified that defendant's version of what occurred on July 23 (i.e., that he stalked Hazlett in the hallway and stairs) was a "lie."  *Id.* at 91; *see also* R. Campbell Aff. at ¶¶ 3, 5.  Ricky agreed that tension existed between him and Hazlett but contends that Hazlett was the one who engaged in intimidating conduct.  *See* R. Campbell Dep. at 91–92, 117.

Plaintiff has also submitted evidence showing that absenteeism did not actually motivate the decision to terminate him.  According to Anthony-Thomas, Ricky reported late for work 28 times from January through April 2019 and left work early on a regularly basis.  *See* Doc. 31-4 at PAGEID 359–61.  However, defendant has not shown that Anthony-Thomas previously disciplined or

---

[10]  As with Brittany's retaliation claims, defendant did not invoke the honest belief rule with respect to Ricky's claims.

warned Ricky about his absences, and indeed plaintiff has shown that he received approval to miss work. Ricky informed Vice President Greg Zanetos of the times he would arrive late or leave early and Greg Zanetos approved of them because Ricky was dealing with "personal emergenc[ies]" relating to his son and daughter. *See* R. Campbell Dep. at 57–64. Further, plaintiff has shown that as a general matter Anthony-Thomas took a lenient stance when an employee missed work due to personal and family needs. *See* B. Campbell Dep. 80–82. As importantly, Trifelos candidly testified in her deposition that absenteeism "had nothing to do with Ricky's termination." Trifelos Dep. at 68 (testifying that he was terminated because "he stalked his supervisor"); *see also* Zanetos Dep. at 72 (not mentioning absenteeism when asked the reasons why Ricky was terminated).

Accordingly, the Court grants the motion for summary judgment as to Ricky's FMLA interference claim and denies the motion as to Ricky's FMLA retaliation claim.

### B. Retaliation for Opposing His Wife's Termination

Plaintiff also asserts that Anthony-Thomas unlawfully terminated his employment because he expressed opposition to his wife's termination. Plaintiff brings this claim under Ohio Revised Code § 4112.02(I), the elements of which were outlined in Part III.B above.

Defendant once more challenges the sufficiency of temporal proximity to support a prima facie case. The Court again finds that plaintiff has satisfied his burden. Ricky testified that in the days following his wife's June 20, 2019 termination, he met with Joe Zanetos and voiced his opposition. A month later, Anthony-Thomas terminated his employment. *See Seeger*, 681 F.3d at 283 (citing cases where temporal proximity of less than three months supported a prima facie case).

In addition, plaintiff has submitted evidence from which a jury could reasonably infer a retaliatory motive. Brittany reported that Ricky had witnessed Spicer, Ricky's supervisor, harass a female subordinate. There is evidence that Spicer became aware of the report on the day Brittany was fired. *See* Spicer Dep. at 32. Ricky then raised opposition to his wife's termination to Zanetos, who later involved Spicer in the decision to terminate Ricky's employment. *See id.* at 107–108.

Defendant next argues that Ricky did not engage in protected activity because he failed to state the reason why he thought the firing was wrong. The Court disagrees because defendant relies solely on Zanetos's testimony about the meeting. *See* Zanetos Dep. at 47 (testifying that Ricky said his wife's termination was "wrong" but that Ricky did not mention her report of sexual harassment). Plaintiff has created a genuine dispute of material fact. According to Ricky, he specifically stated to Zanetos his belief that his wife's firing was unlawful because "she [had] reported the sexual harassment on Ben [Spicer]." R. Campbell Dep. at 114.

For the reasons discussed in Part IV.A above, the Court further finds that plaintiff has made a sufficient showing that the alleged reasons for his termination were pretextual.

Thus, the motion for summary judgment is denied as to Ricky's state law retaliation claim.

### C.    Racial Discrimination

Plaintiff asserts parallel federal and state claims for racial discrimination.  *See Campolieti v. Cleveland*, 184 Ohio App. 3d 419, 426, 921 N.E.2d 286, 291 (Ohio Ct. App. 2009) ("[F]ederal case law interpreting Title VII . . . is generally applicable to cases involving alleged violations of R.C. Chapter 4112.") (internal quotation marks omitted).

To establish a prima facie case of race discrimination under Title VII, plaintiff must show that: "(1) he is a member of a protected class, (2) he was qualified for the job and performed it satisfactorily, (3) despite his qualifications and performance, he suffered an adverse employment action, and (4) he was replaced by a person outside the protected class or was treated less favorably than a similarly situated person outside of his protected class." *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015) (internal quotation marks omitted).

Defendant challenges the fourth element of the prima facie case.  It plainly argues in its motion for summary judgment that "R. Campbell cannot establish a *prima facie* case of race discrimination because he cannot show that a comparable, non-protected person was treated better."  Doc. 32 at PAGEID 467.

It is surprising then that plaintiff claims in his response brief that "[i]n its Motion for Summary Judgment, Defendant ***does not*** dispute that R. Campbell has satisfied the elements of his prima facie case – thereby conceding he has met all elements of his prima facie case."  Doc. 39 at PAGEID 962 (emphasis in original).

Despite this mischaracterization, plaintiff's brief does add that Ricky "was treated less favorabl[y] than his Caucasian counter-part[s]" because Hazlett called him a "kid."[11]  *Id.*

Harassment, slurs, and other derogatory behavior is actionable under Title VII when it is so "severe or pervasive" as to "alter the conditions of the victim's employment and create an abusive working environment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 786 (1998).   A court should examine "all the circumstances," including the "frequency of the discriminatory conduct; its severity;

---

[11]  Plaintiff does not claim the "kid" comment constitutes direct evidence of racial discrimination. *See Umani v. Michigan Dep't of Corr.*, 432 Fed. App'x 453, 459 (6th Cir. 2011) (holding that the "use of the term 'you people' does not qualify as a clear reference to race and is not direct evidence of discrimination") (citing similar cases).

21

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787–88.

The Court readily finds that Hazlett's "kid" comment does not rise to the level of being so severe or pervasive as to alter the conditions of Ricky's employment. Ricky testified, "[O]ne time I was called a 'kid' by Glenn Hazlett." R. Campbell Dep. at 93. The term 'kid' is not a clear racial reference and it is undisputed that Hazlett quickly offered an explanation and apologized to Ricky. *See* R. Campbell Dep. at 94 (testifying that Hazlett explained that he used the word "kid' because he had children Ricky's age); Hazlett Dep. at 59 (testifying that he called Ricky a 'kid' because he was arguing with a supervisor). Hazlett testified that he did not call Ricky a 'kid" ever again. *Id.* Though Ricky was offended, he has not demonstrated that it interfered with his work performance.

This case therefore falls well within the Supreme Court's instruction that "simple teasing, . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher*, 524 U.S. at 788 (internal quotation marks omitted). The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a general civility code. . . . Properly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Id.* (internal quotation marks omitted).

Finally, the Court notes that Ricky testified, "[O]ther guys would cuss and carry on and nothing would get said to them, but anytime I would say a cuss word, they would call me to the office or try to sit down, write me up or something." R. Campbell Dep. at 94. This issue was not discussed or pursued by plaintiffs' counsel in the response brief. In any event, the only comparator offered by Ricky was Vice President Tim Zanetos, who "used to cuss me out all the time, and there was never no disciplinary actions [taken] against him." *Id.* To make a prima facie case for racial discrimination, plaintiff "must show that he was similarly situated in all of the relevant respects to an employee of a different race who was treated better." *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (internal quotation marks omitted). The Court finds as a matter of law that Ricky, working as a cook and box stacker, was not similarly situated in all relevant respects to the Vice President of a family-owned and operated business.

The Court thus grants the motion for summary judgment as to Ricky's claims of race discrimination.

**V.      Conclusion**

For the reasons stated above, defendant's motion for summary judgment (doc. 32) is GRANTED IN PART and DENIED IN PART.  The motion is granted as to Ricky Campbell's claims for FMLA interference and race discrimination, but is denied as to all other claims.


s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: February 11, 2022